In the

# United States Court of Appeals

## For the Seventh Circuit

No. 06-1535

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DEBRA LOGGINS,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 04 CR 537—**Charles R. Norgle, Sr.**, *Judge.*

ARGUED JANUARY 18, 2007—DECIDED MAY 9, 2007

Before BAUER, MANION, and ROVNER, *Circuit Judges.*

BAUER, *Circuit Judge.* A jury convicted Debra Loggins
of robbing a federal credit union in violation of 18 U.S.C.
§ 2113(a). The district court sentenced her to seventy-four
months' incarceration. She appeals, claiming that the
district court erred in (1) barring admission of a state-
ment made by one of her co-defendants; (2) not requiring
her co-defendants to exercise their Fifth Amendment
privilege in the presence of the jury; and (3) denying her
motion for a new trial. We affirm.

## I. Background

On May 27, 2004, Loggins, Tyron Love, Nicole Reynolds, and Mario Johnson drove to a Motel 6 in Harvey, Illinois. According to Reynolds, before reaching the motel, they stopped at a K-mart, where Loggins and Reynolds purchased bandanas and toy guns. Reynolds testified that later at the motel, Loggins removed a gun from her purse, showed it to the other three, and instructed Johnson to carry it the next day because he sounded like the most convincing bank robber. Loggins denied being a party to this exchange and claimed that she did not hear her co-defendants discuss the planned robbery.

The next morning, May 28, Loggins drove Love, Reynolds, and Johnson to the Illiana Financial Credit Union ("IFCU") in Calumet City, Illinois. Loggins parked the car in the credit union's lot and remained in the driver's seat. Reynolds went into the credit union and asked to use the bathroom. When she left the bathroom, Johnson and Love entered the credit union and, with guns drawn, took $7,290. Then, all three ran from the credit union with Love carrying a bag. Loggins admitted that at this point she knew that they had robbed the credit union. When they jumped into the car, Love began screaming at Loggins to drive away. Loggins obliged.

As Loggins pulled away from the credit union, she nearly collided with Pamela Cruz, a vigilant credit union employee, who was arriving for work. A moment later, a dye pack exploded in the bag, and Cruz watched red smoke fill Loggins's car. Cruz promptly called 911 to report what she suspected was a robbery. Love dropped the bag from the car, and the four continued driving. Cruz followed the car as it traveled away at a high rate of speed down local streets and a frontage road along the expressway before eventually turning into a condominium complex. The car broke through the entrance gate of the complex. At this point, Cruz stopped her pursuit.

At the back of the condominium complex, Loggins instructed everyone to get out of her car. Loggins retrieved her purse from the trunk, while Love and Johnson discarded their stained sweatshirts into the trunk. The four walked away from the vehicle towards the front entrance of the condominium. Shortly thereafter, several Calumet police officers arrived and confronted them.

Loggins informed the officers that she had a loaded silver Smith & Wesson .38 revolver gun in her purse. The officers inspected Loggins's car, observing red dye stains on the front passenger seat and scratches and scrapes on the outside of the vehicle that were caused when the car struck the entrance gate to the condominium complex. The officers also recovered two toy guns from the passenger's seat and the back seat.

At the police department, Loggins made written and oral statements acknowledging that she had heard her co-defendants plan a robbery on the eve of the IFCU robbery, and she was aware that her co-defendants had intended to rob the bank. In the statement, Loggins wrote, in part, "I provided a ride to the bank for some of my friends who had jokingly talked about getting some money. I didn't really believe that they were going to actually rob the place until we arrived and they got out of the car and proceeded to go into the bank." According to Agent Grodsinsky, Loggins also said that the gun in her purse was hers and that she had carried it continuously since purchasing it many years ago.

Love, Johnson, and Reynolds pleaded guilty to two counts of robbery: a prior robbery of the Fifth Third Bank in Berwyn that occurred on May 22, 2004, and the May 28, 2004 robbery of the IFCU in Calumet City—all in violation of 18 U.S.C. § 2113(a). Loggins pleaded not guilty.

Prior to Loggins's trial, she filed a motion to compel the testimony of her co-defendants Love and Johnson, and,

alternatively, to require them to invoke their Fifth Amendment in the presence of the jury. Loggins also moved to admit the statement of Love's attorney at his plea hearing that Loggins "was present" at the robbery "but didn't know what was about to happen." The district court denied both motions.

At trial, Loggins contradicted the statements she made shortly after the robbery by testifying that she had no idea that her co-defendants were going to rob the IFCU. She admitted that she knew her co-defendants had robbed the IFCU upon their return to her car when she saw the bag full of money. She also admitted to driving them away from the IFCU at a high rate of speed. Loggins contended that she had panicked and merely wanted to get away.

During the trial in-chief, the prosecution and defense counsel elicited testimony that toy guns were used in the commission of the robbery. During its rebuttal argument, the prosecution asserted that Loggins's .38 revolver was used. Loggins's objection was overruled by the district court. The jury returned a guilty verdict, and the district court sentenced Loggins to seventy-four months' imprisonment. Loggins timely filed this appeal.

## II. Discussion

### A. Love's Statement

At Love's plea hearing, the government asserted that Loggins acted as a getaway driver during the robbery of the IFCU. Love disagreed and his attorney contended that Loggins "was present" at the robbery of the IFCU "but didn't know what was about to happen." Only the district court questioned Love about his plea and his involvement in both robberies.

Loggins moved to admit the statement of Love's attorney as a statement against interest under Federal Rule of Evidence 804(b)(3), as former testimony under Federal Rule of Evidence 804(b)(1), and as exculpatory evidence under *Chambers v. Mississippi,* 410 U.S. 284, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973). The district court denied the motion, finding that the statement was unclear and that "Love cannot testify as to what Loggins did or didn't know with respect to either of these robberies." Additionally, the court found there was no showing that the statement was against the penal interest of the speaker, that it was trustworthy, or that there were corroborating circumstances. We review a district court's evidentiary rulings for an abuse of discretion. *United States v. Bonty*, 383 F.3d 575, 579 (7th Cir. 2004).

### 1. Statement Against Interest

To introduce a hearsay statement under Federal Rule of Evidence 804(b)(3), the proponent must establish that (1) the declarant is unavailable as a witness, (2) the statement was against the declarant's penal interest when made, and (3) corroborating circumstances clearly suggest that the statement is trustworthy. *Bonty*, 383 F.3d at 579. The district court found that Loggins could not meet the second and third prongs of the test; we agree.

Love's attorney's statement did not implicate him nor could it subject him to criminal liability. *See Bonty,* 383 F.3d at 575 (holding that a statement that defendant had nothing to do with the criminal events did not tend to implicate the declarant and was not against the declarant's penal interest). Nor does a statement by an attorney as to his client's belief about another person's state of mind "clearly suggest that the statement is trustworthy."

### 2. Former Testimony

Loggins next asserts that Love's attorney's statement is former testimony. Federal Rule of Evidence 804(b)(1) provides that, as an exception to the hearsay rule, former testimony of an unavailable witness is admissible if it is

> [t]estimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination. Fed. R. Evid. 801(b)(1).

The district court found that the statement by Love's attorney did not qualify under this hearsay exception because the government did not have the opportunity to cross-examine. We agree.

Loggins also challenges the exclusion of the testimony based on her Sixth Amendment right to present a defense. The Supreme Court has held the rigid application of state evidentiary rules unconstitutional when such an application infringes upon the right to present witnesses in one's own defense, particularly when that testimony is critical to the defense's theory of the case. *Chambers*, 410 U.S. at 302-03. However, the right to confront and to cross-examine witnesses is not absolute and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process. *Chambers*, 410 U.S. at 295.

In *Chambers*, the defendant sought to introduce the out-of-court statements of a man, Gable McDonald, who declared that it was he, and not the defendant, who had committed the murder at issue. McDonald made a sworn confession and also admitted to the murder in private

conversations with several of his friends but later repudiated his statements. As a result, the trial court prevented the defense from calling McDonald as an adverse witness and refused to allow the testimony of three witnesses to whom McDonald admitted committing the murder, ruling those statements to be hearsay. The Supreme Court ruled that under the facts and circumstances of that particular case, the mechanistic application of state evidentiary rules, which prevented the defense from introducing evidence regarding McDonald's confession, violated the defendant's due process rights. *Chambers*, 410 U.S. at 302-03; *Horton v. Litscher*, 427 F.3d 498, 506 n.13 (7th Cir. 2005). The Supreme Court found that the witnesses' hearsay testimony was critical to the defendant's defense and noted that the statements were made "under circumstances that provided considerable assurance of their reliability" because there were multiple admissions by another individual that he was the actual killer. *Id.* at 300.

Here, the evidence lacks this exculpatory significance and the reliability necessary to support a Sixth Amendment. The fact that "Loggins was present" at the robbery is undisputed. That she "didn't know what was about to happen" has little exculpatory significance. Although it could corroborate Loggins's trial testimony that she did not initially know about the robbery, nevertheless, as she admits, she knew of the robbery when her co-defendants came running from the credit union to her car. We find that the district court did not abuse its discretion by excluding Love's statement.

## B.  Fifth Amendment Privilege

Loggins next claims the district court erred by denying her request that her co-defendants exercise their Fifth Amendment privilege in the presence of the jury. Prior to

trial, Loggins subpoenaed Love and Johnson to testify on her behalf. Loggins then moved to compel the testimony of co-defendants Love and Johnson and, alternatively, to require them to invoke their Fifth Amendment right before the jury. The district court permitted Loggins to question them at a hearing. Both Love and Johnson invoked their Fifth Amendment right against self-incrimination in response to each question. Following the questioning, the district court denied Loggins's motion to compel their testimony and the alternative request to require them to invoke their Fifth Amendment right before the jury. The court found a reasonable basis for the invocation of the privilege. We review a district court's denial of a defendant's motion to compel a witness to exercise his Fifth Amendment privilege in the presence of the jury for an abuse of discretion. *United States v. Mabrook*, 301 F.3d 503, 506 (7th Cir. 2002).

Loggins argues that the jury should have been permitted to draw an inference from her co-defendants' invocation of their right against self-incrimination, citing to *United States v. Hartmann,* 958 F.2d 774, 789 (7th Cir. 1992). Normally, it is improper for a jury to draw any inference from a person's exercise of his Fifth Amendment right against self-incrimination. *United States v. Taylor*, 154 F.3d 675, 684 (7th Cir. 1997); *Mabrook*, 301 F.3d at 507. "We have never found that it is permissible for a jury to make an inference from the invocation of a witness's assertion of the Fifth Amendment and *Hartmann* only references a First Circuit case stating that the jury may make an inference from the assertion of the privilege during cross-examination." *Mabrook*, 301 F.3d at 507 (internal citations omitted). The district court did not abuse its discretion.

### C. Motion for a New Trial

Lastly, Loggins challenges the district court's denial of her motion for a new trial because the government's rebuttal argument changed its theory of the case by asserting that Loggins's gun was used in the commission of the offense rather than the toy guns. Although use of a firearm was not an element of the charge, it suggests a greater connection between the defendant and the crime by showing that Loggins was a fully knowing participant in the robbery. Because Loggins's trial defense was that she was unaware that her co-defendants were planning to rob the credit union, she asserts that this prejudiced her case. Based on earlier representations, Loggins asserted that she reasonably expected that the government had agreed with the defense that the toy guns were used in the robbery. As a result, Loggins opted not to address the issue in her own testimony, through expert testimony, or in her cross-examination of the bank tellers. Additionally, Loggins claims she would have sought to admit statements made by her co-defendants indicating that they used toy guns during the robbery.

At trial, there was disputed testimony as to the description of the toy guns. At various times, the toy guns were referred to as "silver with a brown handle" or "short and green." Loggins's weapon was consistently referred to as "very long," "big," and "silver." Despite this descriptive testimony, no witnesses were asked to identify which gun was used in the robbery. All three guns and photos of the toy guns, as they were found in the getaway car, were introduced into evidence.

We review the denial of a motion for a new trial for an abuse of discretion. *United States v. Childs*, 447 F.3d 541, 544 (7th Cir. 2006). The charge against Loggins did not require that the government prove that a real weapon was

used during the course of the robbery.[1] Whether the gun was real or a toy was irrelevant because the element of the crime is whether force, violence, or intimidation was used to commit the robbery. Moreover, the existence of the gun and its relationship to Loggins were already part of the evidence. Thus, the prosecutor's comments did not implicate the core issue of Loggins's guilt or innocence. Instead, this argument suggested that Loggins had a larger and more cognizant role in the robbery. With or without the arguments, the elements of the charged crime would still be satisfied.

Nor did the prosecution misstate the admitted evidence. The evidence supported the prosecution's argument that the real gun was used during the commission of the offense. Reynolds testified that Loggins helped plan the robbery by showing the gun to Johnson and instructing him to carry it. Moreover, Agent Grodsinsky testified that Loggins admitted that she was aware the robbery would take place. In fact, Loggins invited the prosecution's comment on which gun was actually used. In her closing, Loggins stressed her theory that Reynolds lied because the toy gun was used during the robbery rather than Loggins's revolver. However, an equally permissible inference from the admitted evidence was that Loggins revolver was used.

---

[1] The jury was instructed: "To sustain the charge of a bank robbery, the government must prove the following beyond a reasonable doubt: First, the defendant took from the person or presence of another money belonging to or in the care, custody, control, management or possession of the Illiana Financial Credit Union; Second, at the time charged in the indictment the Illiana Financial Credit Union had its deposits insured by the National Credit Union Administration; and Third, the defendant acted to take such money by force and violence, or by means of intimidation."

The evidence supporting Loggins's conviction was overwhelming. Through her own admission, Loggins stated that she knew her co-defendants had robbed the credit union when they came running from the credit union and jumped into her car. Irrespective of her prior knowledge, Loggins knowingly drove away from the credit union as a full participant in the robbery. Although the dye pack exploded inside her car and she was being actively pursued, Loggins drove down local streets and a frontage road along the expressway before plowing through the gate of a condominium complex. It is well established that escape is considered part of a robbery. *United States v. Andrews*, 442 F.3d 996, 1002 (7th Cir. 2006); *United States v. Smith*, 415 F.3d 682, 689 (7th Cir. 2005).

Our examination of the record as a whole leads us to conclude that Loggins was not denied due process. Any prejudicial impact of the prosecution's rebuttal argument was insignificant in light of the tremendous weight of the evidence against her. Therefore, the defendant was not denied due process, and the district court did not err in refusing to grant Loggins's motion for a new trial.

## III.  Conclusion

Accordingly, the judgment of the district court is AFFIRMED.

ROVNER, *Circuit Judge*, concurring.  I join the court's opinion. I write separately to express my concern about the government's last-minute change in theory as to which gun was used to commit the robbery.

Loggins' theory of defense was that she did not know in advance of her co-defendants' plan to rob the credit union and that she drove the car away from the credit union in a panic. Her odds of prevailing on this defense were not especially strong, given that participating in an escape from a robbery is considered participating in the robbery itself, *see United States v. Smith*, 415 F.3d 682, 689 (7th Cir. 2005) (coll. cases), *vacated & remanded on other grounds*, — U.S. —, 126 S. Ct. 2859 (2006), and by Loggins' own admission she realized what her co-defendants had done when they ran out of the credit union and jumped into the car with a bag full of money. R. 156-3 at 408, 471. Still, there is an intuitive difference between someone who knows about a robbery plan ahead of time and volunteers for the role of getaway driver and someone who remains in the dark until her co-defendants dash out of the bank, pile into the car, and scream at her to drive away. A sympathetic jury confronted with the second scenario might agree that the driver's heat-of-the-moment decision to step on the gas and get the heck out of Dodge was not a deliberate and culpable decision to aid the robbery.[1]

Use of a real gun was not an element of the offense, as my colleagues point out, but as a practical matter it was quite relevant to Loggins' defense. If it was Loggins' Smith

---

[1] Getaway drivers occasionally do succeed on such defenses. *See, e.g.*, *Briefs, Stuart: 20-year-old cleared of getaway charges*, Stuart (Fla.) News, June 16, 2006, at Local News, 2006 WLNR 10585962; Madelaine Vitale, *Split Verdict in Shootout Killing of Atlantic City Bar Manager*, Press of Atlantic City (N.J.), Feb. 25, 2006, at C1, 2006 WLNR 3340080; Sara Eaton, *Alleged '01 getaway driver cleared; Wendy's employee was shot during pair of robberies*, Fort Wayne (Ind.) Journal Gazette, at 1, 2004 WLNR 15243884.

& Wesson that Johnson held in his hand during the robbery, then it was a more obvious inference that Loggins was in on the plan from the start; indeed, it would confirm Reynolds' testimony that Loggins had participated in the discussion of the robbery the night before and had advised Johnson to use her gun in the robbery, *see* R. 156-1 at 108, 121. This would in turn rule out the possibility that Loggins found out about the robbery only after the fact and drove her cohorts away from the scene of the crime in a panic. *Ante* at 9.

I readily agree with my colleagues that the evidence before the jury supported the prosecutor's contention that Loggins' gun was used to commit the robbery. *Ante* at 10. Although none of the witnesses to the robbery were asked to identity the gun they saw in co-defendant Johnson's hand, in addition to Reynolds' testimony that Loggins had shown her revolver to Johnson and told him to carry it, there was testimony from the credit union tellers describing the gun Johnson was carrying as being big and silver. Having looked at the guns myself, I am satisfied that only Loggins' Smith & Wesson truly meets that description; the plastic toy guns are smaller and have a distinctive blue-green cast to them (although they do have a somewhat metallic sheen).

What is troubling about the government's contention—voiced for the first time in its rebuttal argument—that it was Loggins' gun that was used, is that this was wholly contrary to the position that the government had taken—repeatedly, on the record, and in the presence of the district judge—right up to the eve of trial. When Love pleaded guilty to the May 28 robbery on May 3, 2005, four months before Loggins' trial, the Assistant United States Attorney ("AUSA") represented to the court that the government's evidence would show that "[d]uring the course of the robbery, [c]o-[d]efendant Johnson pointed a toy handgun at bank employees and customers while

instructing them to put their hands up." R. 170 at 13-14. The district judge took note of the prosecutor's description of the gun as a toy and asked her what evidence she had to support that description. *Id.* at 17. The AUSA informed the court that two toy guns had been recovered from inside the getaway car, "[a]nd when compared to the bank surveillance photos and what [the] tellers described, those seemed to match the guns that were used in both robberies. And we believe it was a toy gun used in both the May 22nd robbery and the May 28th robbery." *Id.* at 18. The government made the same representation in its proffer of the evidence against Johnson (who pleaded guilty the same day as Love): the AUSA indicated that "[d]uring the course of the robbery, . . . [d]efendant Johnson . . . pointed a toy handgun at bank employees and customers while instructing them to put their hands up." *Id.* at 50.[2] Love and Johnson themselves specifically represented to the court in their plea colloquies that the guns they had carried were toy guns (although Love could not recall what type of gun Johnson had carried). *Id.* at 21-22, 52. On September 1, 2005, just days before the start of Loggins' trial, co-defendant Reynolds pleaded guilty. Again the government, in outlining its evidence, indicated that "during the course of the robbery, co-defendant Johnson pointed a toy handgun at bank employees and customers while instructing them to put their hands up." R. 134 App. B at 4. Finally, on September 6, 2005, when the government asked for (and received) a delay in the start of Loggins' trial because neither the toy guns nor

---

[2] The government made the same representation in the official version of the offense that it submitted to the probation office on May 19, 2005, for use in preparation of Johnson's pre-sentence report. R. 134 App. C at 4 ("During the course of the robbery, defendant [Johnson] pointed a toy handgun at bank employees and customers while instructing them to put their hands up.").

Loggins' Smith & Wesson revolver could be located in the evidence locker, the AUSA specifically advised the court that the toy guns looked very much like the real gun (Loggins' revolver). R. 173 at 5. "If you laid them side by side without picking them up, they would look almost identical in appearance." *Id.* Again the court expressed interest in which of the guns was used to commit the robbery, and although on this occasion the government did not repeat its earlier refrain that Johnson had pointed a toy gun at the tellers and customers of the credit re-union, it did disavow any intent to show that Loggins' gun had been used to commit the robbery:

> THE COURT:   Once this issue of the guns is resolved, then what inferences is the Court to draw with respect to the three guns, two apparently toy guns and one real gun?
>
> AUSA: . . . The inference regarding the guns would be that there were three guns used. We can't tell the jury which guns were used inside of the May 28 robbery. All we can say is that three guns were found, and that the defendant had the only real gun on her person.

*Id.* at 25.

What the record does not reflect but what we have been told is that once the FBI tracked down the Smith & Wesson and the prosecutor apparently got her first side-by-side look at the three guns just a day or two before the trial commenced, she concluded that the toy guns were readily distinguishable from the real gun and that it likely was Loggins' gun—the Smith & Wesson—that Johnson had used to carry out the May 28 robbery. We do not know whether the tellers themselves would have been able to identify the Smith & Wesson as the gun that Johnson had pointed at them, since none of them was asked to do so at trial. (And I would add that the one

perspective from which it is difficult to distinguish the real gun from the toy guns is when one looks directly into the barrels of the guns—i.e., when they are pointed directly at an individual.) But in any event, the government changed its theory as to which gun Johnson had used, and as I have already acknowledged, the notion that Johnson had carried Loggins' gun into the bank was a plausible one based on the trial evidence, which included the guns themselves, the tellers' testimony about what the gun that Johnson carried looked like, and Reynolds' testimony that Loggins had urged Johnson to carry her gun with him. I agree with my colleagues that the government was entitled to make this argument to the jury. *See ante* at 10.

What I do not think the government was within its rights to do, given the position it had repeatedly taken on the guns prior to trial, was keep quiet about its change of theory until the evidence was closed and the defense counsel had given his closing argument. A defense by its nature is reactive; because it is the government that bears the burden of proof, the defense must respond to what evidence the prosecution puts on and what inferences it asks the jury to draw from that evidence. In the abstract, of course, the prosecutor may have had no obligation to share with the court and with the defense her thoughts as to which of the guns Johnson had used: as discussed, this was much more material to the defense case than it was to the government's. But not only had the government previewed its theory regarding the guns before trial, it had in the course of three separate change-of-plea hearings repeatedly represented to the court as fact that Johnson had used a toy gun—*not* Loggins' Smith & Wesson—in the course of the robbery, and as late as a few days before Loggins' trial was representing to the court that it *could not prove* which of the guns was used inside the credit union. Nothing new or unexpected

emerged at trial in regard to the guns: no witness identified the Smith & Wesson as the gun Johnson had pointed at the tellers and customers of the credit union, for example. Under these circumstances, the defense had no reason to anticipate the about-face that the government performed in its final closing argument.

The government suggests that the defense brought this on itself when Loggins' counsel argued in his own closing statement that Johnson had used a toy gun rather than Loggins' Smith & Wesson to commit the robbery, thus "mak[ing] . . . an issue" of which gun was used. Gov't Br. at 39; *see also ante* at 10. This is revisionist history. The government gift-wrapped this argument for the defense when its *own* counsel repeatedly represented to the court in advance of trial that Johnson had used a toy gun and that it could not prove otherwise. That Loggins' attorney would take up that refrain could have surprised no one: it was part and parcel of the defense theory that Loggins took no part in planning the robbery and had no foreknowledge of it—a theory that was consistently advanced throughout the case. *See*, *e.g.*, R. 173 at 10-11 (Loggins' counsel outlines theory of defense at hearing conducted the week before trial commenced). The problem here was one of the government's making, not Loggins'.

By keeping its change of mind about the guns under wraps until its final closing argument, the government effectively deprived Loggins of the chance to respond. Just as there was evidence to support the government's eleventh-hour contention that Johnson had used Loggins' gun, there was evidence to support Loggins' contrary theory that he had not. During Johnson's plea colloquy, for example, Johnson had read aloud (and swore to the truth of) a signed written statement concerning the May 28 robbery in which he stated that he "displayed a toy gun" during the robbery. R. 170 at 52. Moreover, an FBI forensic expert had prepared a report indicating that, on

review of credit union surveillance photographs, he was unable to determine whether the weapon Johnson held in his hand during the robbery was Loggins' revolver or one of the toy guns (because the photographs were insufficiently detailed). R. 134 App. D. Finally, the fact that the prosecutor did not ask any of the tellers whether they could identify which of the guns Johnson had used suggests it is at least possible that they too might be unable to do so. (Although the differences between the guns seemed rather obvious to me within the sedate confines of my chambers, I can readily appreciate how a witness who had only a moment's glimpse of the gun under highly stressful conditions might be less able to state with confidence which of the guns he or she saw in Johnson's hand.) Of course, Loggins could have sought to introduce this evidence during trial; nothing precluded her from doing that. But she had no reason to do so after the government effectively took that issue off the table by conceding that Johnson had used a toy gun and professing its inability to prove that Johnson had used Loggins' gun. By the time the prosecutor finally put that issue back on the table, the evidence was closed and the defense's opportunity to speak to the jury had come and gone.

As a former prosecutor and district judge, I know that in preparation for trial, opposing parties and judges alike routinely rely on the representations that the parties' counsel make as to what issues and theories they will and will not pursue. This is not to say that a party is forever after bound by whatever pre-trial positions its counsel might take. Things rarely proceed according to plan: new evidence comes to light, witnesses give unexpected testimony, mistakes become apparent, strategies change. Although the government's counsel can perhaps be faulted for not arranging to see the guns further in advance of trial than she did (we are told that Loggins' counsel, by

contrast, had viewed the guns months earlier), once she examined the guns and realized that the weapon witnesses had described as large and silver most likely was Loggins' Smith & Wesson, I believe she was entitled to argue that theory. But given the government's prior on-the-record assertions that Johnson had used a toy gun, I believe the AUSA was obligated to disclose her change of thought to both the court and the defense. Not to do so, and to reserve that announcement for the last moments of trial, was a serious error in judgment. Trial by ambush has absolutely nothing to recommend itself to the judicial process.

The question before us, however, is whether Loggins is entitled to be re-tried, and given the substantial deference we owe to the district court on this question, *e.g.*, *United States v. Woolfolk*, 197 F.3d 900, 904-05 (7th Cir. 1999), I cannot say that it was an abuse of discretion to deny Loggins' Rule 33 motion for a new trial. The government's rebuttal argument, although a surprise to the defense, was consistent with the appearance of the guns and with the tellers' descriptions of the gun that Johnson had used. My sense is that the jury would have drawn the same inference on its own even if the government had not made the argument or if the defense, not having been lulled into a sense of false security by the government's pre-trial statements on this subject, had introduced evidence suggesting that Johnson used (or may have used) a toy gun. Moreover, apart from Loggins' gun, there was substantial evidence indicating that Loggins knew ahead of time that her co-defendants were planning to rob the credit union. Reynolds so testified, of course. Perhaps more importantly FBI Special Agent Gustavo Grodsinsky testified that following her arrest, Loggins admitted to him that she had overheard Johnson and Love discussing the robbery the night before (although she thought this was just idle chatter), R. 156-3 at 502, that on

the morning of the robbery Johnson and Love had awakened her and told her "they were going to get the money," *id.* at 503, and that she continued to think they were joking "*except for* when they told her to get dressed because she[ ] [was] the only person that ha[d] a vehicle and they needed her to drive," *id.* (emphasis mine). Loggins told Grodsinsky that after getting dressed, she drove her co-defendants around town looking at different banks until they settled on the Illiana Financial Credit Union, which Johnson and Love said "looked like a good one." *Id.* at 504. Moreover, Loggins' own written statement (which Grodsinsky read aloud to the jury), although insisting that she had at first believed her co-defendants' talk of a robbery to be a joke, acknowledged that once her co-defendants got out of the car and proceeded *into* the bank, she realized they were not joking. R. 156-4 at 537. At the very least, this evidence suggests that Loggins did not remain in the dark about the robbery as long as her defense posited, and that her decision to drive the getaway car was not truly made in the panic of the chaotic moments after the robbery. Against that backdrop, I am not convinced that the government's unexpected argument that Loggins' gun was used to commit the robbery ultimately made a difference to the outcome of the trial or otherwise affected Loggins' substantial rights. *See generally United States v. Kuzniar*, 881 F.2d 466, 470 (7th Cir. 1989); *United States v. Reed*, 875 F.2d 107, 113 (7th Cir. 1989) (quoting *United States v. Martinez*, 763 F.2d 1297, 1312-13 (11th Cir. 1985)).

With these additional observations, I join the court's opinion and judgment.

No. 06-1535 21

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*