In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 05-4717

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

BILAL MUHAMMAD, also known as
ROBERT BRIGGS,

*Defendant-Appellant.*

_____

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 05 CR 136—**Rudolph T. Randa**, *Chief Judge.*

_____

ARGUED SEPTEMBER 19, 2006—DECIDED SEPTEMBER 14, 2007

_____

Before RIPPLE, MANION and WOOD, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Bilal Muhammad, also known as
Robert Briggs, was indicted in the Eastern District of
Wisconsin on two counts: (1) attempt to possess and to
distribute a controlled substance in violation of 21 U.S.C.
§ 841(a)(1) and (b)(1)(B) and (2) knowingly and corruptly
persuading another person, with intent to hinder, delay
and prevent the communication to a law enforcement
officer, of information relating to the commission of a
federal offense in violation of 18 U.S.C. § 1512(b)(3) and

(2).[1] Mr. Muhammad was tried on September 14, 2005; a jury returned verdicts of guilty on both counts. He was sentenced to 135 months in prison on the first count and 60 months in prison on the second count. The sentences were to run concurrently. Mr. Muhammad filed a timely appeal. He now contends that venue was improper, that the district court erred in not instructing the jury on venue and that his constitutional rights were infringed when the Government introduced evidence that Mr. Muhammad had called his attorney after a vehicle driven by his companions in the scheme was stopped for a traffic violation. That vehicle subsequently was found to contain cocaine. For the reasons set forth in this opinion, we affirm the judgment of the district court.

# I

## BACKGROUND

### A.

During the last week of March 2005, Bilal Muhammad contacted his cousin, James Kendrick Willis, about a vacation to Phoenix, Arizona. Both men lived in Milwaukee. The two determined that they would take a bus from Milwaukee to Phoenix and then return to Milwaukee by bus at the conclusion of the vacation. Before leaving, Mr. Muhammad and Willis went shopping. First, they went to a clothing store where Willis purchased new clothing, cologne and a watch; Mr. Muhammad financed the purchases. Mr. Muhammad also purchased a new

---

[1] This witness tampering charge is not before this court on appeal.

cell phone at a corner liquor store. The men then proceeded to Mr. Muhammad's house where Willis showered and put on his new clothes.

The men got a ride from a friend of Mr. Muhammad's to the bus station in downtown Milwaukee. They missed the bus, but one of Mr. Muhammad's female friends drove the two men to the Greyhound bus station in Chicago. It took the two several days to get to Phoenix. During the trip, Mr. Muhammad's bag was searched at a stop in New Mexico. They arrived in Phoenix very early in the morning of Monday, March 28. Kevin Reid met the men upon their arrival in Phoenix.

After their arrival, Mr. Muhammad called Linda Juarez to discuss whether she would be willing to meet him in Phoenix. Juarez also lived in Milwaukee and the two had become friends. In February 2005, Juarez had gone to Mr. Muhammad's home in Menomonee Falls, Wisconsin, where he had shown her a large sum of money that he had stated totaled $100,000 in cash.

Juarez agreed to come to Phoenix when Mr. Muhammad offered to put her in touch with individuals in Phoenix who could help her with her aspirations to become a clothing designer. The two decided that Juarez would fly to Phoenix on March 30th. Juarez initially had planned to travel with her friend Alice Kovacs, but Kovacs was unable to find someone to watch her son. Juarez telephoned Mr. Muhammad to inform him that Kovacs no longer would be available to accompany her. Mr. Muhammad already had purchased non-refundable tickets for both Kovacs and Juarez. Consequently, when Juarez called to inform Mr. Muhammad that Kovacs would not be able to make the trip, he became agitated. Nevertheless, he agreed to purchase another ticket for Juarez's sister, Tanya

Juarez. Juarez understood that she would be flying both ways, and Mr. Muhammad informed her she could pick up the airline tickets that he had purchased at the airport.

The women left on a flight from Milwaukee and arrived in Phoenix at approximately 7:00 p.m. Mr. Muhammad met them at the airport. He brought Willis and Reid along; Reid drove the car. The five went out to dinner and Mr. Muhammad paid the bill. The two women checked into a hotel, and Mr. Muhammad paid the hotel bill as well. The men stayed at Reid's home.

The next day, Willis and Mr. Muhammad went to the hotel to pick the women up. Mr. Muhammad had told Juarez that she would be meeting with someone to discuss her clothing line. First, however, the group stopped at Reid's home. Mr. Willis went inside for a brief period and then the group proceeded to the bank. Juarez and Mr. Muhammad went into the bank to meet with the manager, but the manager was not available, and, therefore, they decided to return to the bank later. The group next went to the mall where Mr. Muhammad gave both Linda and Tanya Juarez $500 each to spend. The group then returned to the bank, and again only Linda Juarez and Mr. Muhammad entered. Mr. Muhammad had a check for $30,000 which he asked the manager to cash. He stated that the money was for a land auction. After Mr. Muhammad received the money, the pair left the bank. The group then proceeded to a strip mall where Juarez met briefly with a man allegedly willing to help her become a clothing designer. At the meeting, she had the impression that the man was uninterested in clothing design.

At some point during the day, the women learned that they were not going to be flying home, but rather were

going to drive back to Milwaukee. Mr. Muhammad told the women that his secretary had failed to book properly their return flights. Mr. Muhammad and Reid left to obtain another car for the journey back to Milwaukee. Meanwhile, Willis stayed with the women at Reid's home. When Mr. Muhammad and Reid returned, they were carrying large Target-brand plastic bags. They took these bags into the back room, and the men remained there for hours.

The group left for Milwaukee at approximately 10:00 p.m. on April 1. The plan was to drive through the night and to continue until they arrived in Milwaukee. Linda and Tanya Juarez were in one car; Mr. Muhammad and Willis were in another. Mr. Muhammad's car was leading and the women were following, although he had told Juarez to "keep her distance." R.106 at 170. The two cars stopped for gas at the same time, and Mr. Muhammad always paid the bills. The route took the caravan through Texas. Tanya Juarez was driving the second vehicle at the time. At approximately 11:00 a.m. the next day, a Texas state trooper stopped the car for following an eighteen wheeler at an unsafe distance. The trooper asked Tanya Juarez to step out of the car she was driving and into the squad car. Linda Juarez stayed in the car and received a cellular phone call from Mr. Muhammad. He told her not to let the state trooper search the car. Tanya Juarez, however, consented to a search of the vehicle. The state trooper found a rental agreement for the car stating that it was to be returned in Milwaukee. He also discovered three kilograms of cocaine in a suitcase located in the trunk of

the car.[2] The trooper then arrested the sisters; they spent five days in jail before their parents posted bond.

After the sisters had been stopped, Willis heard Mr. Muhammad call someone and state that he would get the sisters a lawyer if they encountered any problems. The Government submitted into evidence a telephone record demonstrating that Mr. Muhammad had called his attorney several times after the women's car had been stopped by the trooper, and commented on these telephone calls during closing arguments. He also had made arrangements, over the phone, to fly out of Oklahoma City. After he finished using his cellular phone, Mr. Muhammad instructed Willis to throw his cellular phone out the window because he feared that it might be bugged. The men then drove to Oklahoma City. Willis took a bus back to Milwaukee and Mr. Muhammad took a plane to the same destination.

---

[2] There is some dispute regarding two computer-generated maps about which the Texas state trooper testified. These maps show routes from Amarillo, Texas to Oklahoma City and from Phoenix, Arizona to Oklahoma City. The Government contends that these maps were demonstrative exhibits created for trial, while Mr. Muhammad argues that the maps were recovered from the Juarez sisters' rental car. The state trooper identified the maps during his direct examination, and stated that the highlighted routes would include the road on which the two women were stopped. The record does nothing to elucidate the origin of these maps. However, the state trooper never stated expressly that he had recovered them in the vehicle.

**B.**

At trial, before the Government rested its case, counsel for Mr. Muhammad asked to be heard on whether venue was proper in the Eastern District of Wisconsin. Both Mr. Muhammad's attorney and the Assistant United States Attorney submitted memoranda to the court on this subject.

Mr. Muhammad's counsel argued that our decision in *United States v. Tingle*, 183 F.3d 719 (7th Cir. 1999), ought to control. He argued that all of the events that actually occurred in the Eastern District of Wisconsin should be characterized as merely preparatory and thus incapable of supporting venue in that district. At the close of the prosecution's case, Mr. Muhammad's counsel reiterated his venue argument. He contended that the case was mischarged as an attempt crime and should have been charged as a completed offense in a different venue.

The Government replied that *Tingle* was not controlling because, in *Tingle*, the offense charged was the completed offense. Venue had been improper in that case because no aspect of the completed crime actually had been committed in the Eastern District of Wisconsin. In the Government's view, Mr. Muhammad's actions constituted the exact sort of conduct prohibited by the attempt statute because he had taken substantial steps towards committing the offense of possession with intent to distribute. He had called Juarez, brought her and her sister to Phoenix at his expense and had sent them back to Milwaukee in a car that he had rented, containing a suitcase filled with three kilograms of cocaine.

The district court concluded that the evidence presented permitted the inference that Mr. Muhammad had at-

tempted to possess cocaine with the intent to distribute it in Milwaukee. Noting that the burden of proof was by a preponderance of the evidence, the district court ruled that venue was proper in the Eastern District of Wisconsin for the crime of attempted possession.

After this ruling, the defense requested that the district court instruct the jury that, if venue were not proper in the district charged, the defendant should not be convicted. The defense submitted that venue was in issue because Mr. Muhammad's counsel had moved to dismiss on venue grounds and had raised this objection before the close of the Government's case. The Government argued that there were no disputed facts relating to venue and therefore an instruction was not required and the issue could be resolved as a matter of law. The district court agreed with the Government and ruled that, because the relevant facts necessary to determine venue were not disputed, it could resolve the issue as a matter of law. Accordingly, the district court refused to give an instruction. The jury returned a verdict of guilty on both counts charged in the indictment and returned a special verdict as to the weight of the cocaine recovered from the car.

## II

## DISCUSSION

### A.

Mr. Muhammad renews his submission before the district court that venue in the Eastern District of Wisconsin was improper. In assessing this contention, we begin with a discussion of the governing legal principles.

**1.**

The constitutional venue provisions at the heart of this case are rooted in our Nation's colonial experience. They are far more than a legal technicality. During the colonial period, officials of the Crown became concerned that American colonial courts would not protect adequately royal interests. Drew L. Kershen, *Vicinage*, 29 Okla. L. Rev. 803, 805 (1976). Therefore, Parliament revived an ancient statute that permitted Americans, charged with a crime on colonial soil, to be moved to England or another colony for trial. *Id.* at 805-06. This practice angered colonial Americans, and the practice was listed in the Declaration of Independence as one of the reasons justifying independence. Specifically, King George III was criticized "for transporting us beyond Seas to be tried for pretended offenses." The Declaration of Independence para. 20 (U.S. 1776); *see also* Albert W. Alschuler & Andrew G. Deiss, *A Brief History of the Criminal Jury in the United States*, 61 U. Chi. L. Rev. 867, 875 (1994).

This historical experience led to the inclusion of an explicit provision in the Constitution to guard against a repetition of the colonial era abuse. Article III of the Constitution of the United States generally requires that the trial of any crime be held in the state where that crime was committed. U.S. Const. Art. III § 2 cl. 3. The Sixth Amendment further states that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed." U.S. Const. amend. VI. The Federal Rules of Criminal Procedure provide for the practical application of this guarantee by providing that "the prosecution shall be had in a district in which the offense was committed." Fed. R. Crim. P. 18.

In protecting these constitutional guarantees, our colleagues on the United States Court of Appeals for the Second Circuit were not far from the mark in *United States v. Reed*, 773 F.2d 477 (2d Cir. 1985), when they noted that the present case law of the Supreme Court of the United States does not set forth, in any definitive way, a comprehensive discussion of the values protected by the constitutional venue provisions. Nevertheless, the Court has given us significant assistance in discerning those values. The Supreme Court has stated that venue determinations "raise[] matters that touch closely the fair administration of criminal justice and public confidence in it . . . . Questions of venue in criminal cases . . . raise deep issues of public policy . . . ." *United States v. Johnson*, 323 U.S. 273, 275-76 (1944). Certainly, given our Nation's history, one underlying policy concern is the protection of a defendant from prosecution in a place far from his home and the support system that is necessary to mount an adequate defense. *See United States v. Cores*, 356 U.S. 405, 407, 410 (1958). Justice Joseph Story articulated this value in his treatise:

> The object . . . is to secure the party accused from being dragged to a trial in some distant state, away from his friends, witnesses, and neighborhood; and thus subjected to the verdict of mere strangers, who may feel no common sympathy, or who may even cherish animosities, or prejudices against him. Besides this; a trial in a distant state or territory might subject a party to the most oppressive expenses, or perhaps even to the inability of procuring proper witnesses to establish his innocence.

Joseph Story, Commentaries on the Constitution § 925 (Carolina Academic Press reprint 1987) (1833), *reprinted in*

*United States v. Palma-Ruedas*, 121 F.3d 841, 861-62 (3d Cir. 1997) (Alito, J., dissenting). The Court also has articulated a concern that a criminal trial take place where the crime took place. *See Johnson v. United States*, 351 U.S. 215, 220-21 (1956); *see also Travis v. United States*, 364 U.S. 631, 640-41 (1961) (Harlan, J., dissenting).

The Supreme Court has set forth the basic inquiry that the lower courts must undertake in addressing the question of venue. First, we must ascertain whether there is any statutory directive on the matter of venue. In the absence of such legislative direction, which is the situation before us here, we should use as a "general guide," *United States v. Cabrales*, 524 U.S. 1, 6 (1998), "the nature of the crime alleged and the location of the act or acts constituting it." *United States v. Anderson*, 328 U.S. 699, 703 (1946); *see also Cabrales*, 524 U.S. at 6-7. We shall examine each of these factors. In doing so, however, we shall not forget that the Supreme Court has referred to these two factors simply as a guide, not a rigid test. Nor shall we forget the admonition of our sister circuits that

> there is no single defined policy or mechanical test to determine constitutional venue. Rather the test is best described as a substantial contacts rule that takes into account a number of factors—the site of the defendant's acts, the elements and nature of the crime, the locus and effect of the criminal conduct, and the suitability of each district for suitable fact-finding.

*Reed*, 773 F.2d at 481; *see also United States v. Zidell*, 323 F.3d 412, 423 (6th Cir. 2003) (quoting *United States v. Williams*, 274 F.3d 1079, 1084 (6th Cir. 2001)).

Finally, throughout our inquiry, we must keep in mind that, because venue is not an element of the offense, the

Government has the burden of establishing venue by a preponderance of the evidence rather than by the higher standard of beyond a reasonable doubt. *United States v. Tingle,* 183 F.3d 719, 727 (7th Cir. 1999).

### 2.

We turn first to the "nature of the crime alleged." *Anderson*, 328 U.S. at 703. In undertaking this part of the analysis, we are aided significantly by the thoughtful approach set forth by our colleagues in the First Circuit in *United States v. Georgacarakos,* 988 F.2d 1289, 1293 (1st Cir. 1993) ("To determine venue, we examine the key verbs in the statute defining the criminal offense to find the scope of relevant conduct.") (internal citations and quotation marks omitted).

In the context of this case, there are two substantive criminal statutes pertinent to this issue: (1) Section 841(a)(1), together with its penalty provision, subsection (b)(1)(B), of Title 21 proscribe the possession of cocaine with intent to distribute; (2) Section 846 of Title 21 proscribes an "attempt" to commit the criminal act proscribed by the earlier section. As suggested by the First Circuit, we must focus on the key verbs in this statutory prohibition in order to determine where, for purposes of the constitutional venue guarantee, we can say that the crime took place. *Id.*

The key verbs in the first statutory section under scrutiny are "possess" and "distribute." Section 846 of Title 21, the second section, proscribes an "attempt" to commit the criminal act proscribed by the earlier section. Here, the key verb is "attempt." In short, the Government charged Mr. Muhammad with: (1) having acted with the intent to

possess the cocaine with the intent to distribute it; and (2) having taken a substantial step toward the completion of that criminal objective. *United States v. Haddad*, 976 F.2d 1088, 1094 (7th Cir. 1992). In determining the scope of the criminal acts described by these verbs, we recall several basic criminal law principles. First, an attempt is an inchoate crime. It does not require the completion of the underlying offense. *United States v. Rosales-Cortez*, 19 F.3d 1210, 1217 (7th Cir. 1994). Second, distribution and possession with intent to distribute are continuing crimes.[3] Congress has determined that, with respect to a continuing crime, venue is proper in any district where the crime began, continued or was completed. *See* 18 U.S.C. § 3237(a).[4] However, actions that are merely preparatory

---

[3]  *See United States v. Medina*, 992 F.2d 573, 587 (6th Cir. 1993); *United States v. Uribe*, 890 F.2d 554, 559 (1st Cir. 1989); *United States v. Baskin*, 886 F.2d 383, 388 (D.C. Cir. 1989); *United States v. Stitzer*, 785 F.2d 1506, 1519 (11th Cir. 1986); *United States v. Brunty*, 701 F.2d 1375, 1382 (11th Cir. 1983); *see also United States v. Fleischli*, 305 F.3d 643, 658 (7th Cir. 2002) (possession of a firearm) (superseded by statute on other grounds); *United States v. Tingle*, 183 F.3d 719, 727 (7th Cir. 1999) (distribution).

[4]  18 U.S.C. § 3237(a) provides:

> (a) Except as otherwise expressly provided by enactment of Congress, any offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed.

> Any offense involving the use of the mails, transportation in interstate or foreign commerce, or the importation of an object or person into the United States is a continuing

(continued...)

are not probative in determining the nature of the crime. *Tingle*, 183 F.3d at 726.

As our sister circuits have pointed out, to satisfy the terms of the continuing offense venue statute, it is not essential that the defendant ever have been physically present in the district in question, so long as the offense continued into the district. *Zidell*, 323 F.3d at 422. Moreover, by its nature, a criminal attempt can be completed long before the underlying criminal act. As soon as the defendant has the requisite intent and undertakes a substantial act in furtherance of the commission of the underlying criminal offense, the criminal attempt is completed.

### 3.

Following the "general guide" set forth by the Supreme Court in *Anderson* and in *Cabrales*, we now turn to a determination of the "location of the act or acts constituting" the crime in question. At the outset, we take note of a point emphasized by the Court of Appeals for the Second Circuit in *United States v. Reed*, 773 F.2d 477 (2d Cir. 1985):

> [A]n analytical flaw . . . has plagued analysis in this area. Both courts and commentators have tended to construe the constitutional venue requirement as fixing a single proper situs for trial. It is clear, however,

---

[4] (...continued)
offense and, except as otherwise expressly provided by enactment of Congress, may be inquired of and prosecuted in any district from, through, or into which such commerce, mail matter, or imported object or person moves.

> where the acts constituting the crime and the nature of the crime charged implicate more than one location, the constitution does not command a single exclusive venue. The constitution requires only that the venue chosen be determined from the nature of the crime charged as well as from the location of the act or acts constituting it, and that it not be contrary to an explicit policy underlying venue law.

773 F.2d at 480.

*Reed* also warns that an overly mechanistic approach to the location of the defendant's acts may limit unrealistically the permissible venues in terms of the policy concerns that underlie the constitutional venue guarantee. Most importantly, the Second Circuit noted that "places that suffer the effects of a crime are entitled to consideration for venue purposes. Such districts have an obvious contact with the litigation in their interest in preventing such effects from occurring. To some extent this factor overlaps with the definition and nature of the crime." *Id*. at 482.

In this case, we must apply these principles to a criminal undertaking that began in the Eastern District of Wisconsin, drew upon resources from the Eastern District of Wisconsin for supplemental support, and was, without any doubt, intended, from its very beginning, to have its sole effect in the Eastern District of Wisconsin. It was there that Mr. Muhammad intended to possess his dangerous drugs for distribution. The plan that was designed to bring these drugs to Wisconsin is, unfortunately, not an unusual event in today's United States. Criminal undertakings—many of them drug transactions—that transcend state and other governmental boundaries occur regularly. In enacting the venue statute for continuing crimes, Congress recognized that, while remaining true to

the constitutional guarantees, our venue rules must be sufficiently malleable to accommodate the reality that criminal activity may implicate many locations.

It well may be that prosecution of Mr. Muhammad in a federal district in Texas or Arizona also would have been permissible. However, as Justice Harlan reminded us in his dissenting opinion in *Travis*, 364 U.S. at 640, the fact that other venues are appropriate certainly does not preclude the possibility that the present one, here the Eastern District of Wisconsin, is also a constitutionally appropriate venue.

Mr. Muhammad submits that venue in Wisconsin is precluded by our holding in *United States v. Tingle,* 183 F.3d 719, 727 (7th Cir. 1999), because, he submits, his actions in the Eastern District of Wisconsin were merely preparatory. As that case came to us, the venue issue involved a single count of the distribution of cocaine. While the indictment charged that the distribution had occurred in both the Eastern District of Wisconsin and the Northern District of Illinois, the Government had failed to demonstrate that *any* activity involving that particular count occurred in Wisconsin. Therefore, venue in the Eastern District of Wisconsin was improper. By contrast, we are dealing here with an attempt count that alleges that Mr. Muhammad attempted to possess cocaine with intent to distribute in the Eastern District of Wisconsin. The evidence demonstrates that *all* of his efforts were aimed at his possessing that cocaine in Wisconsin.

The undertaking to bring that cocaine into Wisconsin began in Wisconsin when Mr. Muhammad recruited the assistance of Willis and made some purchases to use in the execution of the plan. During the trip, when the search of his baggage in New Mexico made it clear that

transportation of the cocaine back to Wisconsin in the duffle bags by bus would be a risky business, Mr. Muhammad developed an alternative plan by calling two women in Milwaukee, convincing them to come to Phoenix and then having them act as "mules" for the trip back to Milwaukee. He then undertook substantial steps to organize a return trip to Wisconsin. He rented an automobile for the women who were to act as mules for the transport of the cocaine; he set up a two-car convoy for the trip. He would lead the way; the car carrying the cocaine was to follow, but not too closely. The convoy then started out for Wisconsin. Had it not been for the intervention of the state trooper, Mr. Muhammad's plan would have brought him and his cocaine to Wisconsin, ready for distribution.

### 4.

As we noted earlier, our colleagues in other circuits have applied the "general guide" of the Supreme Court by applying a "substantial contacts" approach to determine whether a particular jurisdiction can serve as the venue for a federal criminal trial in a manner consistent with the guarantees of the constitutional venue provisions. Under that approach, a court considers " 'the site of the defendant's acts, the elements and the nature of the crime, the locus and effect of the criminal conduct, and the suitability of each district for accurate fact-finding.' " *Zidell*, 323 F.3d at 423 (quoting *Williams*, 274 F.3d at 1084); *see also Reed*, 773 F.2d at 481; *cf. United States v. Frederick*, 835 F.2d 1211, 1215 (7th Cir. 1987) (noting, in the context of a conspiracy count, that "[p]roper venue is not limited to districts where the defendants were physically present when they committed unlawful acts. So long as an overt

act in furtherance of the conspiracy *is intended to have an effect in the district where the case is finally brought*, venue is proper." (emphasis added)).

Permitting venue for this case in the Eastern District of Wisconsin is certainly compatible with the criteria of this approach. Although the defendant's acts occurred in several states, they were aimed at only one state—Wisconsin. The alleged crime was the inchoate one of attempted possession with intent to distribute, and, at the time his plan was thwarted, Mr. Muhammad certainly had moved far beyond mere preparatory acts. Rather, he had constructive possession of the cocaine and had placed in motion a carefully constructed plan that was designed to place those drugs within the Eastern District of Wisconsin. Clearly, Mr. Muhammad intended that the effect of his actions was to be felt in that district.

Since most of the witnesses were based in Wisconsin, that venue certainly had at least the same capacity to permit the gathering of necessary information as any of the other possible venues. The defendant, moreover, was certainly not deprived of his support system in mounting his defense. Wisconsin is his home state.

Accordingly, we must conclude that the district court correctly determined that venue in the Eastern District of Wisconsin was constitutionally permissible.

**B.**

Mr. Muhammad also challenges the district court's refusal to instruct the jury on venue. We review a district court's denial of a request for a jury instruction for abuse of discretion. *United States v. Smith*, 308 F.3d 726, 740 (7th Cir.

2002). We have held that a defendant is not entitled to a venue instruction unless venue is specifically at issue. *See, e.g.*, *United States v. Rodgers*, 755 F.2d 533, 549 (7th Cir. 1985) (citing *United States v. Massa*, 686 F.2d 526, 530 (7th Cir. 1982)). When venue is undisputed, determination by the district court as a matter of law is appropriate. *Massa*, 686 F.2d at 531.

Mr. Muhammad submits that venue is in dispute, and, therefore, that the district court abused its discretion in not giving an instruction. In *Rodgers,* we determined that the defendant was disputing *liability* for distribution, not the *location* of the distribution. Consequently, an instruction on venue was not necessary. *Rodgers*, 755 F.2d at 549. The district court took a similar view of the situation here. It believed that the only issue before the court was whether Mr. Muhammad knew about the cocaine in the second car of the caravan.

Upon examination of the record, we believe that the situation is somewhat more nuanced. First, although the principal factual dispute at trial centered on whether Mr. Muhammad had knowledge of the cocaine that was found in the car the Juarez sisters were driving, Mr. Muhammad also raised the issue of venue. Before the close of the Government's case, Mr. Muhammad's counsel made an oral motion to dismiss for lack of proper venue. When that motion was denied, counsel subsequently requested a jury instruction on venue. In *Massa*, we said that an instruction on the issue of venue is warranted particularly where "the defendant objects to the lack of an instruction, thereby calling the issue to the attention of the district court." *Massa*, 686 F.2d at 530. On the other hand, as our colleagues in the Third Circuit succinctly pointed out in *United States v. Perez*, 280 F.3d 318 (3d Cir. 2002), "[e]ven

if a defendant properly objects to venue, however, it does not become a fact question for the jury unless the defendant also places it in issue by establishing a *genuine* issue of material fact with regard to venue." *Id.* at 335 (emphasis added).

Here, Mr. Muhammad attempted to place venue in issue by inviting the district court's attention to the fact that the rental car in which he was leading the caravan was due to be returned to the rental company at its Phoenix facility by a deadline that precluded a trip to Milwaukee and a return trip to Phoenix. This deadline, the defense argued, raised not only a question as to whether Mr. Muhammad knew about the cocaine in the other car, but, in the alternative, raised a question about Mr. Muhammad's intended destination for the contraband.

Because "[v]enue is ordinarily a question of fact for the jury to decide," *United States v. Bascope-Zurita*, 63 F.3d 1051, 1062 (8th Cir. 1995) (internal citations and quotation marks omitted), we agree with our sister circuits that, in a case such as this one, the best practice would have been to give a venue instruction. *See United States v. Winship*, 724 F.2d 1116, 1126 n.13 (5th Cir. 1984). However, as we said in *United States v. Marrinson*, 832 F.2d 1465, 1475 (7th Cir. 1987), the defendant must, by his factual submissions, "make venue a serious issue." *Id.* Whether assessed from a quantitative or a qualitative perspective, the evidence that Mr. Muhammad intended the cocaine to reach Wisconsin so that he could control it there for distribution was overwhelming. By contrast, the fact that the rental car was to be returned to Phoenix is very weak evidence that Mr. Muhammad intended the contraband to arrive at a different location. Indeed, as the evidence at trial demonstrated, he dropped the vehicle off in Oklahoma City

despite the earlier designation of Phoenix. Finally, it is worthy of note that, although the jury was not given an instruction on venue, they were presented with evidence of the rental contract and its designation of Phoenix and, nevertheless, they decided, at least implicitly, that both Mr. Muhammad and the cocaine were Milwaukee bound.

As we said on a similar occasion, "[p]erhaps another trial judge would have given a venue instruction out of abundance of caution, but the failure to do so in this case was not error." *Marrinson*, 832 F.2d at 1475. We need only add that, if it was error, it was certainly harmless.

## C.

Mr. Muhammad submits that he was prejudiced by the introduction of evidence, followed by the commentary of the prosecutor, that he had contacted his lawyer when the Juarez sisters were stopped by a state trooper.[5] In his

---

[5] At trial, the district court read a stipulation to the jury which stated that Mr. Muhammad's attorney had given the men a ride to the airport in Milwaukee. In addition, the attorney's telephone numbers were identified in the stipulation. The district court also admitted an exhibit which listed Mr. Muhammad's telephone activities during the trip. During summation, the Government's attorney referenced the exhibit which documented Mr. Muhammad's telephone calls to "give[] you a window as to what was going on inside the car occupied by the defendant and Ken." R.108 at 538. Later in the closing argument, the Government's attorney stated:

He is calling an attorney. And remember, Ken said that [he] heard him talking on the phone. [Ken didn't] know who he

(continued...)

view, the introduction of this evidence and the commentary of counsel violated his constitutional rights under the Fifth and Sixth Amendments.[6]

The parties agree that no objection was made to this evidence or to the prosecutorial comments. Because Mr. Muhammad did not make a timely objection, he forfeited this issue for appeal. Consequently, our review is for plain error. *See United States v. Luepke*, ___ F.3d ___, No. 06-3285, 2007 WL 2091227, slip op. at 10 (7th Cir. July 24, 2007). In order to find that a deprivation of substantial rights constituted plain error we must determine: "(1) that error occurred; (2) that the error was plain; and (3) that the error affected the defendant's substantial rights." *Id.* "If these criteria are met, we may reverse, in an exercise of discretion, if we determine that the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* (internal quotations omitted).

Here, the Government tried to introduce evidence of Mr. Muhammad's phone call to his attorney as *substantive*

---

[5]  (...continued)
> was talking to. But he said they may need a lawyer. And we know who he was talking to. He was talking to a lawyer. Why? Speeding? In Arizona? Give me a break. You know he knew what was up. He knew that cocaine was going to be found.

R.108 at 540.

[6]   It is clear that the Sixth Amendment right to counsel does not attach until the initiation of adversary criminal proceedings. *See McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991). No prosecution had been commenced at the time Mr. Muhammad placed a telephone call to his attorney. Therefore, the Sixth Amendment affords him no protection.

evidence of guilt. This situation is different from one in which the Government attempts to *impeach* a defendant with his silence or the invocation of his right to an attorney. In *Jenkins v. Anderson*, 447 U.S. 231, 238 (1980), the Supreme Court held that the Fifth Amendment's privilege against self-incrimination is not violated when the Government uses a defendant's pre-arrest silence to impeach his credibility. *Id. Jenkins* explicitly reserved, however, the question of whether such evidence could be used against a defendant, not for impeachment purposes, but for substantive evidence of guilt. *Id.* at 236 n.2.

We have held, in *United States ex rel. Savory v. Lane*, 832 F.2d 1011 (7th Cir. 1987), that the prohibition on the use of a defendant's silence as substantive evidence of guilt "applies equally to a defendant's silence before trial, and indeed, even before arrest." *Id.* at 1017. In *Ouska v. Cahill-Masching*, 246 F.3d 1036 (7th Cir. 2001),[7] we revisited our

---

[7] There is currently a division among the federal Courts of Appeals as to whether the prosecution may admit properly evidence of a defendant's pre-arrest silence as substantive evidence of guilt. Our colleagues on the Sixth Circuit, in *Combs v. Coyle*, 205 F.3d 269 (6th Cir. 2000), canvassed this division as it existed in 2000. *Id.* at 282. At that time, the First, Seventh and Tenth Circuits had held that the prosecution may not comment on a defendant's pre-arrest silence, holding that such comment violates the Fifth Amendment. *Id.* The Fifth, Ninth and Eleventh Circuits, however, had held that the use of a defendant's pre-arrest silence in the Government's case-in-chief presented no constitutional violation. No federal Courts of Appeals have revisited the issue in the context of *pre-arrest* silence since the Sixth Circuit analyzed the division of authority on this issue in 2000.

(continued...)

holding in *Savory* and again held that the prosecution's attempt to use pre-arrest, pre-*Miranda* silence as substantive evidence of guilt violates a defendant's constitutional rights under the Fifth Amendment. *Id.* at 1049.[8]

In this case, the Government did not comment on Mr. Muhammad's pre-arrest silence. Rather, the Government introduced evidence that Mr. Muhammad had called his attorney after the women traveling in the second car of the caravan were stopped by the trooper. The Supreme Court, interpreting post-*Miranda* warnings silence has stated that "silence does not mean only mute-ness; it includes the statement of a desire to remain silent as well as of a desire to remain silent until an attorney has been consulted." *Wainwright v. Greenfield*, 474 U.S. 284, 295 n.13 (1986). The question therefore is whether the prosecution's comment on a defendant's pre-arrest consultation with counsel, as opposed to silence, likewise falls within the ambit of the Fifth Amendment's protection against self-incrimination.

Mr. Muhammad contends that the Government's introduction of evidence regarding a phone call that he placed

---

[7] (...continued)

In addition, the Eighth and Ninth Circuits have both held that comment on the *post-arrest, pre*-Miranda silence of a defendant violates the Fifth Amendment. *See United States v. Frazier*, 408 F.3d 1102, 1109-11 (8th Cir. 2005); *United States v. Whitehead*, 200 F.3d 634, 639 (9th Cir. 2000).

[8]  Both *United States ex rel. Savory v. Lane*, 832 F.2d 1011 (7th Cir. 1987), and *Ouska v. Cahill-Masching*, 246 F.3d 1036 (7th Cir. 2001), came to this court on collateral review. However, our holding that the introduction of a defendant's pre-arrest silence as substantive evidence of guilt applies with equal force in the context of a direct appeal.

to his attorney violated his Fifth Amendment right against self-incrimination because the comments permitted the jury to draw the inference that he had knowledge that there was cocaine in the trunk of the car. Neither this court nor the Supreme Court has held that the introduction of substantive evidence about a defendant's attempt to contact his attorney in order to prove guilt violates a defendant's constitutional rights.

We need not decide this issue today. Given the ambiguity in the present case law, any error was certainly not "plain." It was neither "clear" nor "obvious." *United States v. Olano*, 507 U.S. 725, 735 (1993). Neither the Supreme Court nor this court has held expressly that admitting such evidence for use in the prosecution's case-in-chief amounts to a constitutional violation.

Moreover, even if we were able to say that the error was "plain," we could not conclude, given the quantum and quality of the evidence, that Mr. Muhammad was harmed by the admission of the testimony. On the issue of whether he knew of the presence of the cocaine, the evidence supporting the Government's case can only be described as extremely strong. Finally, if we were to reach the issue, concerns about the fairness, integrity or public reputation of the proceedings certainly would not justify, as a matter of our discretion, the reversal of Mr. Muhammad's conviction.

### Conclusion

For these reasons, the judgment of the district court is affirmed.

AFFIRMED

A true Copy:

Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*