In the

# United States Court of Appeals

### For the Seventh Circuit

————————

No. 07-2552

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

PRINCE S. KNOX,

*Defendant-Appellant.*

————————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 06 CR 917—**Suzanne B. Conlon**, *Judge.*

————————

ARGUED MAY 9, 2008—DECIDED SEPTEMBER 2, 2008

————————

Before FLAUM, KANNE, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* Appellant Prince Solomon Knox entered the United States as part of a refugee resettlement program. He was later indicted and convicted essentially for lying to the United States government by denying involvement with armed rebel groups in connection with his admittance into the country. We address three main issues in this appeal—a venue question; Knox's request, which the district court denied, to go to Africa

for investigation/depositions; and two challenges to the sufficiency of the evidence.

## I. Background

During the 1990s Liberia was in the midst of several civil conflicts. The Department of State, the Office of United Nations High Commissioner for Refugees, and the Department of Homeland Security ("DHS") began a United States resettlement program for Liberians in Côte d'Ivoire (a.k.a. the Ivory Coast) who could not return to Liberia or remain in Côte d'Ivoire because of the civil unrest. Eligible individuals could apply to enter the United States as refugees. Defendant Prince Solomon Knox was from Sierra Leone, but his wife, Elizabeth Knox, from Liberia, could apply for her entire family. Knox, Elizabeth Knox, and their daughter applied under this program. Of course, to be admitted, applicants had to meet the qualifications, one of which, relevant here, deemed persons who had belonged to or assisted disfavored armed groups ineligible.

There are three such rebel groups we concern ourselves with in this case: the National Patriotic Front of Liberia ("NPFL"), the Independent National Patriotic Front of Liberia ("INPFL"), and the Revolutionary United Front ("RUF"). The RUF was known for grievous human rights violations, the disturbing details of which are unnecessary to recount for our present purposes. See Revolutionary United Front, http://en.wikipedia.org/wiki/Revolutionary_ United_Front (last visited Aug. 4, 2008); *see also Kamara v. Attorney General of the United States*, 420 F.3d 202, 207

(3d Cir. 2005) (describing some of the RUF's "grievous human rights violations"). The State Department has designated the RUF as a terrorist organization on the terrorist exclusion list since December 2001.

On December 9, 2003, a State Department employee interviewed the Knox family in Abidjan, Côte d'Ivoire. At that time, in response to questions from DHS immigration officer David Radel, Knox denied that he had ever been a member of disfavored armed groups, denied that he had assisted them, and denied having served or participated in military service or armed conflict. Similarly, on Form I-590, Registration for Classification as Refugee, Knox answered that he had no membership in and provided no aid to armed groups. He also answered "none" when directed on the form to list "political, professional or social organizations of which I am now or have been a member or with which I am now or have been affiliated with since my 16th birthday." Radel also completed Form G-646, Sworn Statement of Refugee Applying for Admission, into the United States on Knox's behalf. Knox answered "no" to the following questions: "Have you ever provided support, including housing, transportation, communications, funds, documents, weapons or training for any person or organization that has ever engaged in or conspired to engage in sabotage, kidnaping, assassination, hijacking, or any other form of terrorist activity?" and "Have you ever been a representative or member of a terrorist organization or a member of a group which endorses terrorist activity?" These and other similar statements are also confirmed in Radel's written notes of the interview.

Radel recommended that Knox be resettled in the United States on or about December 9, 2003. Knox entered the United States on April 14, 2004, through the Chicago O'Hare international airport. He presented the I-590 Form stamped by Radel to the DHS officer at O'Hare. Knox then moved to St. Louis, Missouri. It was in Missouri that Knox was arrested on December 21, 2006. The government had come to believe that Knox had belonged to or supported the RUF, NPFL, and/or INPFL, and therefore, lied on the forms and to Radel.

Knox was charged in a four-count indictment—two counts for making materially false statements to federal agents and two counts for visa fraud, in violation of 18 U.S.C. §§ 1001 and 1546. The first count addressed lying under oath on Form I-590, which was submitted at O'Hare to gain entry. The second was for false statements on Form G-646. Count Three was for making similar false statements to Radel in Côte d'Ivoire. Count Four was for lying to an Immigration and Customs Enforcement agent on or about March 29, 2006, "in the Eastern District of Missouri and Northern District of Illinois." (It appears that this "lie" was Knox claiming he had never held a gun, a statement made in a recorded telephone call between Knox and a government agent.) The district court found Knox indigent and appointed counsel.

The factual crux of the case is whether Knox lied about his involvement in these rebel groups. The majority of the events related to the charges occurred in Sierra Leone, Liberia, and Côte d'Ivoire. Accordingly, the defense sought to investigate and possibly depose potential wit-

nesses in West Africa. Knox filed a written application for authorization of extraordinary and substantial travel and expert witness expenses with the intent to ultimately take foreign depositions under Federal Rule of Criminal Procedure 15. The district judge denied the application without prejudice due to "vagueness" and a "failure to address the legal basis for taking foreign depositions in three unidentified West African countries."

Knox filed another motion for leave to take foreign depositions and identified four prospective witnesses by name and address who were believed to have personal first-hand knowledge concerning whether the defendant was a member of any of the relevant groups. Knox also pointed out that the government would be bringing over witnesses from Africa. The court gave Knox an opportunity to supply additional information (costs, etc.), including in camera disclosures of the basis for believing the witnesses would appear voluntarily, how they would be contacted, etc. The government also filed its opposition to Knox's request(s). The court concluded that the defense did not provide enough detailed information, Knox having only explained that travel to West Africa was necessary to investigate, locate, and interview these individuals and that then more information would be available. The court found this "problematic and unworkable." The defense could not provide the requisite notice of when and where the depositions would occur. The district court also faulted Knox for failing to address the legality of the proposed investigations under the sovereign laws of the relevant foreign nations or the diplomatic implications to the United States. The court

found it "speculative" that Knox's proposed depositions would ever even occur or that they would preserve material evidence under these unreliable circumstances. The court, in a separate ruling, also denied expenses for travel and expert services in Africa. Knox persisted nonetheless, filing an emergency motion and an amended emergency motion for the district court to reconsider. The district court was not persuaded, and the court denied the motions for reconsideration.

At trial the government's witnesses testified to the following: they saw Knox serving as a bodyguard for an RUF leader, saw him carrying an AK-47 rifle, saw him at RUF meetings, observed him with RUF members, heard him go by the name of a leader of the INPFL, saw him in RUF apparel, heard him brag about being a rebel fighter, overheard him tell about killing a family, and knew that he was having an affair with an RUF leader's wife. Knox's only trial witness was his estranged wife, who hadn't met him until 1996 or 1997 (a government witness testified regarding events dating as far back as 1992). She denied ever seeing him in rebel garb or associating with the rebel groups. She admitted to a 7-8 month separation and admitted that Knox never took her to his home and that he told her it was none of her business who his people were when she asked. The government also elicited testimony that Knox hit her and threatened to take their daughter shortly before their interviews with the State Department.

At the close of the government's case the defendant made a Rule 29 motion for acquittal, but cited no specific

grounds. He renewed the motion after closing arguments. The jury convicted on all four counts. Knox was sentenced to 12 months' imprisonment and three years of supervised release. His sentence was completed on or about December 14, 2007. Knox is currently in custody with the Bureau of Immigration and Customs Enforcement, which has initiated removal proceedings.

Knox now appeals. There are three major aspects to his appeal that we will take up in turn: a question about proper venue; a review of the district court's decision to deny Knox's request to go to West Africa to investigate and depose potential witnesses; and two sufficiency-of-the-evidence challenges.

## II. Venue

Knox argues that venue in the Northern District of Illinois was improper with respect to Counts Three and Four. The general rule is that we review de novo a district court's denial of a motion for judgment of acquittal due to improper venue. *See United States v. Ringer*, 300 F.3d 788, 790 (7th Cir. 2002). However, this itself presents us with a hurdle—whether Knox preserved this issue with his generic Rule 29 motion for acquittal, as to either or both counts, and if not preserved, whether that failure was waiver or forfeiture.

Conventionally, a waiver is a knowing and intentional relinquishment of a right, while forfeiture is the result of unintentional relinquishment. *E.g.*, *United States v. Charles*, 476 F.3d 492, 495 (7th Cir. 2007). Waiver precludes review,

whereas forfeiture permits review for plain error. *Id.* In *Ringer* we found that "[a] claim of improper venue is waived if the issue is apparent on the face of the indictment and an objection is not made before the close of the government's case." *Ringer*, 300 F.3d at 790. We continued, "[I]f the indictment does not provide notice of a possible defect in venue and the government rests without proving that the crimes occurred in the district charged, the defendant may then file a venue objection in a motion for acquittal." *Id.*

### A. Count Three

We begin with Count Three. The alleged violation of 18 U.S.C. § 1001 occurred "in Abidjan, Ivory Coast" according to the indictment. The indictment did not in any way plead that the alleged false statements with which Knox was charged had any impact in the Northern District of Illinois. Therefore, we conclude, without much difficulty, that notice of a possible defect in venue was "apparent on the face of the indictment." Accordingly, Knox waived the argument by not making an objection before the close of the government's case. *Id.*; *United States v. Brandon*, 50 F.3d 464, 469 (7th Cir. 1995); *United States v. John*, 518 F.2d 705, 709 (7th Cir. 1975); *United States v. Bohle*, 445 F.2d 54, 58-59 (7th Cir. 1971) (explaining that "where the fact of improper venue is apparent on the face of the indictment, it has been uniformly held that the objection is waived if not presented before the close of the Government's case" (citing Wright's Federal Practice & Procedure: Criminal § 306)), *overruled on other grounds by*

*United States v. Lawson*, 653 F.2d 299, 303 n.12 (7th Cir. 1981); *see also United States v. McDonough*, 603 F.2d 19, 22 n.1 (7th Cir. 1979).

Knox urges us to discard *Ringer*'s application of the waiver standard and apply the distinction we now draw between waiver and forfeiture—which Knox believes would result in our finding that he only forfeited, rather than waived, the argument. We disagree, however, with Knox's premise that our court's more recent applications of the waiver/forfeiture distinction are inconsistent with *Ringer*. Where venue was not adequately pleaded from the outset and the potential defect is apparent on the face of the indictment (such as this case where the only location mentioned is in Africa), failing to raise such an obvious issue is logically considered a knowing and intentional relinquishment. Therefore, consistent with both our traditional waiver/forfeiture distinction and our governing case law, Knox waived any venue argument with respect to Count Three by not raising a venue objection before the close of the government's case.[1]

---

[1] Even if we were to reject *Ringer* as Knox requests and somehow conclude that he had until the end of the government's case to raise a venue objection, we would nevertheless find that he waived the argument, because his "objection" at the close of the government's case, discussed *infra* in Part B, was inadequate and did not preserve the venue issue for appeal.

## B.  Count Four

The venue issue regarding Count Four is more difficult. Count Four of the indictment alleged that the 18 U.S.C. § 1001 violation occurred "in the eastern District of Missouri and the Northern District of Illinois." Therefore, unlike Count Three that only mentioned Côte d'Ivoire, we cannot say that any potential venue defect presented itself on the face of the indictment. As we said in *Ringer*, "if the indictment does not provide notice of a possible defect in venue . . . the defendant may then file a venue objection in a motion for acquittal" at the end of the government's case. *Ringer*, 300 F.3d at 790. Thus we are presented with the question of whether the bare Rule 29 motion, which did not mention venue (or anything else) specifically, was sufficient to preserve the venue issue.[2]

The government has the burden of proving venue by a preponderance of the evidence. *E.g.*, *United States v. Muhammad*, 502 F.3d 646, 652 (7th Cir. 2007). In *United*

---

[2] The relevant exchanges were brief indeed. At the end of the government's case, counsel for Knox addressed the court: "I would make a rule 29 motion for judgment of acquittal on all four counts of the indictment, but I will waive any argument at this time." The judge responded at once, first noting his construction of the evidence in a light most favorable to the government, then finding "[T]he government has established a prima facie case as to all four counts." Later, after closing arguments, Knox's counsel again requested "[C]ould the record reflect a renewal of my Rule 29 motion of acquittal, and I will waive argument?" The court responded: "All right. Your motion is noted and denied."

*States v. Jones*, we found that "the motion for acquittal made at the conclusion of all the evidence properly raised the question of venue in the court below." 174 F.2d 746, 748 (7th Cir. 1949). We explained that it was a challenge that the government failed in its proof and that the rules do not require specifics in the motion. The government has a duty to prove its case, including venue, and if it "is challenged as to sufficiency by a general motion for acquittal, it is the Government's duty to require the defendant to be specific in his objection, and a failure to do so will not enable the Government on appeal to say that the question was not specifically raised below." *Id.*

However, thirty years later we expressed doubt about *Jones* and have continued to move away from that holding. *McDonough*, 603 F.2d at 22 ("[W]e have some question about the continued viability of the *Jones* rule . . . ."). In *McDonough*, distinguishing without overruling *Jones*, we focused on the district judge's question asking if there was anything specific that would justify a directed acquittal, and found that "the failure to urge the matter [of venue] when asked to be specific forecloses, in our opinion, raising the question on this appeal." *Id.* We criticized the defendant's interpretation of *Jones* which would give "the defendant the right to conceal possible reversible error, even . . . when the grounds for objection would have been . . . easily discovered." *Id.* We also went on to discuss the unique nature of venue, explaining that while part of the government's case, it can be waived, is not part of the charged offense, and need only be proved by a preponderance of the evidence. *Id.*

Similarly in *United States v. Todosijevic*, 161 F.3d 479, 482 (7th Cir. 1998), we found a Rule 29 motion insufficient to preserve an issue "because [the defendant] rests her current challenge on grounds *different* from those she relied on in her motion to the trial court." *Id.* We highlighted, as in *McDonough*, the defendant's failure to raise additional issues in response to the judge's query as to whether there were other possible grounds. *See also id.* at 482 n.3 (mentioning another case in which we had explained in dicta that "the defendant waived the sufficiency of evidence argument on all grounds except that which he relied upon at the trial court level"). And in *United States v. Rodriguez*, we concluded, in dicta, that the defendant's "contention with respect to venue [wa]s untimely" because his "motion for acquittal did not raise the venue issue." 67 F.3d 1312, 1317-18 (7th Cir. 1995).

Other circuits seem to follow approaches more akin to our recent cases rather than the approach in *Jones*. Many cases conclude, similar to our approach in *Todosijevic*, that if specific issues are argued with the motion for acquittal, the ones that are not asserted are waived. *See, e.g.*, *United States v. Phillips*, 477 F.3d 215, 219 (5th Cir. 2007) (finding when a defendant asserts, in a Rule 29 motion, specific grounds for a specific element of a specific count, he waives all others for that count); *United States v. Chance*, 306 F.3d 356, 369 (6th Cir. 2002) ("Although specificity in a Rule 29 motion is not required, where the defendant makes a Rule 29 motion on specific grounds, all grounds not specified in the motion are waived."). Others conclude more directly that an objection to venue is waived when not specifically raised in the Rule 29 motion. *See, e.g.*,

*United States v. Rommy*, 506 F.3d 108, 119 (2d Cir. 2007) ("[T]he law treats objections to venue as waived 'unless specifically articulated in defense counsel's motion for acquittal.' "); *United States v. Carbajal*, 290 F.3d 277, 289 n.19 (5th Cir. 2002) ("[The defendant] failed to preserve this issue for appeal by specifically raising the issue in his motion for acquittal or by requesting a jury instruction on venue."); *United States v. Potamitis*, 739 F.2d 784, 791 (2d Cir. 1984) ("A general motion for a judgment of acquittal . . . is not sufficient to raise and preserve for appeal the question of venue."). *But see United States v. Zidell*, 323 F.3d 412, 421 (6th Cir. 2003) (concluding that a general Rule 29 motion preserved the venue challenge).

In reaching these conclusions, these courts focused, as we have in this circuit, on the unusual status of venue. While very important—as the defendant notes, it's in the Constitution twice, U.S. Const. art. III, § 2, cl. 3; amend. VI—venue is universally recognized as waivable. It is not an element of the charged crimes. And, as such, while the burden does rest with the prosecution, that burden of proof is only a preponderance of the evidence (unlike the "beyond a reasonable doubt" standard for the elements of the crime itself). Furthermore, a defendant should not be permitted to hide in the weeds with an objection (especially on a waivable issue with a lower proof burden) only to pounce on appeal just in case things do not go as desired in the court below. The take-away message is that venue can be waived and a defendant needs to be specific in a motion for acquittal in order to preserve a venue argument for appeal.

Unlike *McDonough* and *Todosijevic*, the record here does not reflect any inquiry on the part of the judge inviting the defendant to argue specific grounds of the Rule 29 motion. Therefore, we cannot simply distinguish *Jones*. Given the move in our own circuit away from *Jones* and the similar treatment in cases from our sister circuits, we take this opportunity to clarify our position and in doing so overrule *Jones*.[3] We now make explicit that a bare Rule 29 motion for acquittal that does not even mention venue waives the venue argument and fails to preserve the issue for appeal.[4] Applying this to the facts of the instant case we find that Knox did not preserve the venue challenge. Thus, the issue is waived, and nothing more need be said.

---

[3] This opinion has been circulated among all judges of this court in regular active service under Circuit Rule 40(e). No judge favored a rehearing en banc on the question of overruling *United States v. Jones*.

[4] This conclusion is analogous to our discussion *supra* explaining that where a venue issue is obvious on the face of the indictment, the failure to raise the issue is a knowing relinquishment (especially since venue is waivable anyway). *See Ringer*, 300 F.3d at 790. Once the government reaches the end of its case without proving venue, then it's just as if the deficiency is obvious on the face of the indictment, and a defendant's failure to raise a venue objection by that time is logically considered knowing and intentional.

### III.  Foreign Funding

Knox applied for funds to travel to West Africa to investigate and depose witnesses under 18 U.S.C. § 3006A(e)(1) and Federal Rule of Criminal Procedure 15; the district judge denied his requests. 18 U.S.C. § 3006A(e)(1) authorizes investigative and expert expenditures on behalf of indigent defendants when necessary for adequate representation. We review a district court's decision to grant or deny such funds under 18 U.S.C. § 3006A(e)(1) for abuse of discretion. *See United States v. Smith*, 502 F.3d 680, 686 (7th Cir. 2007). Rule 15 of the Federal Rules of Criminal Procedure also permits a defendant to make a motion to depose witnesses—an unusual occurrence in a criminal case—when "exceptional circumstances" warrant it. This is also reviewed for abuse of discretion. *See, e.g.*, *United States v. Thomas*, 62 F.3d 1332, 1340 (11th Cir. 1995); *United States v. Kelley*, 36 F.3d 1118, 1125 (D.C. Cir. 1994).

In *Smith*, the defendant sought funds for a fingerprint expert. We explained that under 18 U.S.C. § 3006A(e)(1) "[t]he government will give an indigent defendant access to expert services adequate to facilitate the defendant's representation if the court finds that the services are necessary" and that they should be provided "where 'a reasonable attorney would engage such services for a client having the independent financial means to pay for them.'" *Smith*, 502 F.3d at 686 (citing *United States v. Cravens*, 275 F.3d 637, 639 (7th Cir. 2001)). Furthermore, before granting the expenditures, the court may consider whether the defendant has a "plausible defense" as the

government does not have to "finance a fishing expedition." *United States v. King*, 356 F.3d 774, 778 (7th Cir. 2004) (internal quotation omitted).

We addressed the Rule 15 "exceptional circumstances" requirement briefly in *United States v. Morrison*, 946 F.2d 484, 490 (7th Cir. 1991), where we affirmed a district court's denial of a request for money to travel to Puerto Rico to interview witnesses, take depositions, and investigate the scene of a drug ring's alleged operations. We explained that "a showing of exceptional circumstances must be considerably more concrete and particularized than mere speculation about the possible need for depositions in the future." *Id.* Beyond this brief treatment in *Morrison*, we have not had the occasion to outline any "test" for when the "exceptional circumstances" threshold would be met justifying authorization of foreign depositions; therefore we take note of some factors considered relevant by other circuits. The Ninth Circuit considered whether the deponent would be available at the proposed location of the deposition, whether the deponent would be willing to testify, and the safety of United States officials in going to the foreign location. *See United States v. Olafson*, 203 F.3d 560, 567 (9th Cir. 2000). The Eleventh Circuit focused on the materiality of the proposed testimony, the availability of the witness, whether injustice will otherwise result without the material testimony that the deposition could provide, and whether countervailing factors would make the deposition unjust to the nonmoving party. *See Thomas*, 62 F.3d at 1340-41. The D.C. Circuit listed as critical factors the materiality of the testimony and the unavailability of the witness to testify

at trial and also noted that there is "typically some show-ing, beyond 'unsubstantiated speculation,' that the evidence exculpates the defendant." *Kelley*, 36 F.3d at 1125 (citing cases from the Third, Fifth, and Ninth Circuits).

As we described, Knox made many attempts to obtain authorization for expenses to investigate and depose witnesses in the West African countries of Sierra Leone, Liberia, and Côte d'Ivoire. We are not unsympathetic to his desire to investigate and depose witnesses there—he is correct that many of the events relevant to his case occurred there. However, we do not find that the district court abused its discretion in denying funds for a proposal accurately characterized by the district court as "problematic and unworkable."

Specifically, addressing Rule 15's requirements, we conclude Knox's request was not sufficiently "concrete and particularized" to justify authorizing the expenditures. *Morrison*, 946 F.2d at 490. Moreover, Knox's request would fail under nearly all of the factors we cited from other circuits. Knox could not provide when or where the potential witnesses would be found. He had their addresses but offered nothing to establish the individuals would be present at any given date or time—or how he would get over the hurdle of no phone or email availability. For example, one witness's address was in Sierra Leone, but Knox indicated that the witness was also believed to spend time in Côte d'Ivoire and that he might be found there; plans for tracking this witness down were not offered. Considering this search would involve crossing international borders, it is not

an insignificant question. Such an absence of attention to detail pervaded Knox's entire request.[5] Similarly, the materiality of the potential testimony seemed based entirely on conjecture and speculation. No details were given regarding the expected substance of their testimony or how it would exculpate Knox. Knox also did not disclose any basis, other than a familial relation to the defendant, for why these individuals would be willing to testify voluntarily. There was also a rather cavalier attitude toward international law and diplomatic concerns raised by the district judge. Knox argued that such matters were not his concern; nevertheless, surely he cannot expect a United States court to authorize such expenses to engage in investigating terrorist group membership without detail on the legality of investigating and taking depositions in these countries. In the end Knox simply did not demonstrate the requisite "exceptional circumstances" for Rule 15 depositions.

Knox argues that he may have been able to furnish these answers if he had been given investigative funding under § 3006A(e)(1). He asserts that his request was a two-step process and that he could have been given funds to

---

[5] In essence, Knox was seeking funds to first find these individuals, then to interview them, and only after that to announce whether he would seek to depose them. If nothing else was flawed about this request, the holding pattern that would be imposed on the attorney for the government raises serious concerns. Government counsel would need to be in a position to be in an unspecified location in West Africa, perhaps on short notice, for an indefinite period.

go investigate, after which he could satisfy the Rule 15 requirements. But we conclude his § 3006A(e)(1) requests failed for many of the same reasons. He could not provide sufficient details for the trip regarding when, where, and how he would make contact with the witnesses. We understand that there were difficulties given the undeveloped communications infrastructure in some areas; however, Knox did not suggest how he intended to overcome this challenge. He provided only a vague trip itinerary, and the estimated expenses were equally broad and without detail, as well as possibly in excess of the statutory amount. *See* 18 U.S.C. § 3006A(e)(3) ("Compensation to be paid to a person for services rendered by him to a person under this subsection, or to be paid to an organization for services rendered by an employee thereof, shall not exceed $1,600, exclusive of reimbursement for expenses reasonably incurred, unless payment in excess of that limit is certified by the court . . . ."). His "spreadsheet" for the 12-day trip had only six itemized entries and totaled $34,565.30. (Although in a later motion he did indicate the costs would be less.) Knox did not make a convincing showing that these expenses were "necessary" for adequate representation and that "a reasonable attorney would engage such services for a client having the independent financial means to pay for them."

To recap, while Knox was persistent in his requests, those requests simply did not provide enough information to justify granting them. He had not contacted potential witnesses; he could not provide a proposed itinerary; he did not sufficiently address the practical or diplomatic

issues inherently related to going to foreign countries
for these purposes. He could not provide the government
with notice of when or where such depositions might
occur or even a proposal of how this might be arranged.
While some difficulties making arrangements to inter-
view and depose these witnesses may be understandable
given the remote areas being dealt with, it is those very
circumstances and the nature of this case (involving
terrorist activities and rebel groups) which heightened
the concerns and made the need for planning more acute.
Too many unknowns remained unresolved and unre-
searched for the government to foot the bill for what
appeared a bit like a "fishing expedition" into seemingly
unknown and potentially shark-infested waters. Knox has
not shown on appeal that the district court abused its
discretion in denying the requests.

We also note that Knox presented a constitutional
argument on this issue, specifically raising his Sixth
Amendment right to present a defense. However, as Knox
admitted in his brief, this right "is not unlimited and may
'bow to accommodate other legitimate interests in the
criminal trial process.'" *Horton v. Litscher*, 427 F.3d 498, 504
(7th Cir. 2005) (quoting *Chambers v. Mississippi*, 410 U.S.
284, 295 (1973)). Requiring more from Knox in this
instance to support his requests was quite reasonable and
clearly in furtherance of other legitimate interests. Cer-
tainly, there are occasionally situations where procedural
rules must bend to the demands of the Constitution. *See,
e.g.*, *Chambers*, 410 U.S. at 302-03. Knox, however, has
presented no compelling reason that the rules applied here,
Rule 15 and § 3006A, should bend to accommodate his

"fishing expedition," and he has presented no persuasive argument that the rules were "arbitrary" or "disproportionate to the purposes they are designed to serve." *Horton*, 427 F.3d at 503 ("[R]ules 'designed to assure both fairness and reliability in the ascertainment of guilt and innocence' . . . do not abridge an accused's right to present a defense so long as they are not 'arbitrary or disproportionate to the purposes they are designed to serve.'" (quoting *Chambers*, 410 U.S. at 302 and *Rock v. Arkansas*, 483 U.S. 44, 56 (1987)). We do not find that his constitutional rights were violated, especially since he fell short in establishing the materiality of the potential testimony and the availability of any of the potential witnesses and did not establish the "necessity" of the funding, as we discussed *supra*. *Cf. United States v. Loggins*, 486 F.3d 977, 982 (7th Cir. 2007) (finding the evidence at issue "lack[ed] th[e] exculpatory significance and the reliability necessary to support a Sixth Amendment violation").

## IV. Sufficiency of the Evidence

Lastly, Knox challenges the sufficiency of the evidence with respect to Counts One and Two. We review de novo and will reverse a conviction only when no rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found the essential elements of the crime beyond a reasonable doubt. *E.g.*, *United States v. Mendoza*, 510 F.3d 749, 752 (7th Cir. 2007). This standard is "highly deferential" and "nearly insurmountable." *Id.* (internal quotations omitted).

Count One charged Knox in connection with responding "none" when asked to list political, professional, or social organizations of which he was now or has been a member or with which he was or had been affiliated since his 16th birthday on Form I-590. He argues that the government never proved that the RUF or any other armed rebel group at issue was a "political, professional, or social organization." He makes an analogy to the United States Army, expressing doubt that a United States soldier would say he belonged to a "political, professional, or social organization." The RUF and related groups were described as terrorist organizations, not groups with political or social agendas. Knox agrees the evidence supported a finding that he belonged to an armed group, but he points out that was not what the government had to show.

Knox's argument with respect to Count Two is similar. Count Two alleges two knowing false statements of material fact: First, that Knox lied on Form G-646 denying he ever provided support, including housing, transportation, communications, funds, weapons, documents, etc. for any person or organization that has engaged in or conspired to engage in sabotage, kidnaping, assassination, hijacking, or any other form of terrorist activity; Second, that he lied on Form G-646 when he denied ever being a representative or member of a terrorist organization or a member of a group which endorses terrorist activity. Knox argues that while he stipulated at trial that the RUF is on the terrorist exclusion list, the government did not establish that Knox knew any of this when he was responding to Radel's questions. He asserts that the

testimony from the government's witnesses establishing Knox's connection with these groups (serving as an armed guard at a speech, wearing rebel garb, etc.) falls short of acts (kidnaping, assassination, hijacking, etc.) referred to in the form and does not establish that Knox knew that the RUF was a terrorist organization engaged in such acts.

The government, in response to the Count One argument, notes that testimony from multiple witnesses established that the RUF was a political or social organization. Specifically an expert testified that there were social, political, and military aspects to the organization. Testimony from other witnesses included references to "battling the government" and other similar comments. The government's response with respect to Count Two is that Knox's claim that he did not know RUF engaged in terrorist activities, etc. is incredible. Witnesses testified that Liberia and Côte d'Ivoire were war-torn countries experiencing severe civil conflict with armed groups burning whole villages and massacring civilians. In fact, these circumstances are what prompted the creation of the refugee program to which the Knox family applied.

Given a defendant's "uphill battle" in mounting a sufficiency-of-the-evidence challenge, we conclude the evidence was sufficient for any trier of fact to find Knox guilty of visa fraud as charged in Counts One and Two. The testimony collectively was sufficient to enable a jury to reasonably conclude that the rebel groups at issue would accurately be described as "political, professional, or social" organizations. Witnesses also testified that Knox

served as a bodyguard for a RUF leader, was seen at RUF meetings, was seen carrying a gun, had said he killed a family, and went by the name of an INPFL leader, among other things. Given this involvement and the state of civil unrest generally, a jury could reasonably infer, with little effort, that Knox could not help but be aware of the group's terrorist bent. Thus, Knox does not prevail on these sufficiency-of-the-evidence challenges.

## V.  Conclusion

For the foregoing reasons, the judgment of conviction is AFFIRMED.